## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## CASE NO. 5:16-CV-298-BO

| | |
|---|---|
| GARY AND ANNE CHILDRESS, RUSSELL AND SUZANNAH HO, MICHAEL CLIFFORD, DAVID CAVENDER, RUSTY DAVIS, CHRISTOPHER DERINGER, CHRISTINA DUNCAN, ROBIN HINSON, AND DAVID ORTIZ *on behalf of themselves and others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> JP MORGAN CHASE BANK, N.A., and CHASE BANK USA, N.A., <br><br> Defendants. | **AMENDED COMPLAINT— CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs GARY AND ANNE CHILDRESS, RUSSELL AND SUZANNAH HO, MICHAEL CLIFFORD, DAVID CAVENDER, RUSTY DAVIS, CHRISTOPHER DERINGER, CHRISTINA DUNCAN, ROBIN HINSON, AND DAVID ORTIZ (collectively "Plaintiffs"), individually and on behalf of a class of similarly situated persons, hereby file this Amended Class Action Complaint, making the allegations herein upon personal knowledge as to themselves and their own acts, and upon information and belief and based upon investigation of counsel as to all other matters, as set forth herein.

## <u>INTRODUCTION</u>

1.      Since the beginning of the Iraq War through the present, members of our military services have been asked to make many sacrifices for our nation. One of these sacrifices is financial; leaving family, friends and the comforts of civilian life to answer our country's call to

duty also requires leaving behind employment, a career, and financial security. The Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. §§ 3901 *et seq.* (formerly 50 U.S.C. App. §§ 501 *et seq.*), was enacted to address this sacrifice, and seeks "to enable [servicemembers] to devote their entire energy to defense needs of the Nation." 50 U.S.C. § 3902(1). The SCRA guarantees that all debts incurred by a servicemember before being called to active duty are reduced to a 6% interest rate, from the date deployment orders are received through the ensuing active duty period as required by 50 U.S.C. § 3937. The Act also requires financial institutions to permanently forgive interest above 6%.

2.     To attract and retain the businesses of active military members, Defendants JP Morgan Chase & Co., JP Morgan Chase Bank, N.A., Chase Bank USA, N.A., and Chase BankCard Services, Inc. (collectively "Defendants") implement the SCRA through a proprietary program which, consistent with the practices of other banks, provides benefits that are more generous than required by the SCRA.

3.     Defendants market heavily to military servicemembers, with a dedicated website (chasemilitary.com) and slogans such as "Your commitment is to our country. Our commitment is to you." Defendants have failed to honor the active duty status of America's fighting forces by: (1) charging an illegally high interest rate and improper fees on the debts of thousands of servicemembers, in violation of the SCRA and Defendants' contractual duties; (2) allowing these unlawful interest charges to improperly inflate servicemembers' principal balances; and (3) charging compound interest on these inflated balances.

4.     Defendants then concealed their SCRA violations from the thousands of military families victimized by Defendants' practices. Plaintiffs and other class members did not discover that Defendants were violating their rights until 2016, when Defendants sent misleading

correspondence and payment checks to some military families. When Defendants' actions led Plaintiffs to investigate Defendants' compliance with the SCRA, they discovered that Defendants had uncovered wholesale violations of the SCRA and damages to thousands of military families.

5.     The named Plaintiffs include servicemembers who defended this nation in military service. Their spouses and they now seek to defend thousands of servicemembers by enforcing their rights under the SCRA.

## JURISDICTION AND VENUE

6.     Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1331 because this action arises, in part, under the laws of the United States, particularly the Servicemembers Civil Relief Act ("SCRA") 50 U.S.C. § 3901 *et seq*. Section 4042(a) provides a private right of action to remedy violations of the SCRA.

7.     In addition, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) and (6) because the aggregate claims of the proposed class members exceed $5,000,000, and at least one named Plaintiff resides in a different state than Defendants. The amount in controversy in this matter includes, but is not limited to, actual and consequential monetary damages, disgorgement of Defendants' ill-gotten gains, punitive damages, and attorneys' fees and costs.

8.     This Court has personal jurisdiction over Defendants, as they conduct business activities which are the subject of the present complaint in North Carolina.

9.     Venue is proper in this Court, as named Plaintiffs reside in this district, Defendants conduct business within the district, and some of the business activities which are the subject of this Complaint occurred therein.

## **PARTIES**

10.     Plaintiffs file this Complaint in their individual capacity, and as a class action on behalf of themselves and all others similarly situated. They, along with other class members who may be named as class representatives at the time a motion is filed to certify the proposed class, will represent the following class: All persons in the United States who had an interest-bearing obligation or liability to Defendants or related entities which were subject to the SCRA, and whose interest rates on such obligations or liabilities were not properly reduced or forgiven during active military service pursuant to 50 U.S.C. § 3937, as implemented through Defendants' proprietary SCRA program, but excluding persons who have previously released the claims asserted herein.

11.     Plaintiffs Gary and Anne Childress (the "Childresses") reside in Raleigh, NC. They had one or more interest-bearing obligations to Defendants, including credit card debt, in 2008, when Gary Childress was called to active service in Iraq as part of the Army National Guard. Defendants denied him his rights and benefits under the SCRA.

12.     Plaintiffs Russell and Suzannah Ho (the "Hos") reside in Crestview, FL. They had one or more interest-bearing obligations to Defendants, including credit card debt, in 2006, when Russell Ho was called to active service, and later when he was called overseas to Iraq and Afghanistan. Defendants denied him his rights and benefits under the SCRA.

13.     Plaintiff Michael Clifford resides in Hingham, MA. He had one or more interest-bearing obligations with Defendants, including credit card debt, during his active duty service. Defendants denied him his rights and benefits under the SCRA.

14.     Plaintiff David Cavender resides in Kennesaw, GA. He had one more interest-bearing obligations with Defendants, including credit card debt, during his active duty service. Defendants denied him of his rights and benefits under the SCRA.

15.     Plaintiff Rusty Davis resides in Houston, TX. He had one more interest-bearing obligations with Defendants, including credit card debt, during his active duty service. Defendants denied him of his rights and benefits under the SCRA.

16.     Plaintiff Chris Deringer resides in York, PA. He had one more interest-bearing obligations with Defendants, including credit card debt, during his active duty service. Defendants denied him of his rights and benefits under the SCRA.

17.     Plaintiff Christina Duncan resides in Umatilla, FL. She had one more interest-bearing obligations with Defendants, including credit card debt, during her active duty service. Defendants denied her of her rights and benefits under the SCRA.

18.     Plaintiff Robin Hinson resides in Lakewood, OH. She had one more interest-bearing obligations with Defendants, including credit card debt, during her active duty service. Defendants denied her of her rights and benefits under the SCRA.

19.     Plaintiff David Ortiz resides in Chicago, IL. He had one more interest-bearing obligations with Defendants, including credit card debt, during his active duty service. Defendants denied him of his rights and benefits under the SCRA.

20.     Defendant JP Morgan Chase Bank, N.A. ("JP Morgan Chase Bank"), a Delaware corporation, is a national banking association with headquarters in New York, New York.

21.     Defendant Chase Bank USA N.A. ("Chase"), a wholly-owned subsidiary of JP Morgan Chase, is a national banking association with its principal place of business located in Wilmington, Delaware.

## CLASS ACTION ALLEGATIONS

**Class Definition**

22. In accordance with FED. R. CIV. P. 23, Plaintiffs bring this action in their individual capacity and as a class action on behalf of themselves and all others similarly situated. They, along with other class members who may be named as class representatives will represent the following class certified by order of this Court dated July 2, 2019: All persons who, at any time on or after January 1, 2005 (the "Class Period"), received reduced interest and/or fee benefits from defendant Chase Bank USA, N.A. on a credit card obligation or account because of an obligor's military service, but excluding persons who have executed a release of the rights claimed in this action..

23. This class action satisfies the requirements of FED. R. CIV. P. 23, including, but not limited to, numerosity, commonality, typicality, adequacy and predominance.

**Impracticable Joinder**

24. The proposed class is composed of thousands of persons, geographically dispersed throughout the United States, the joinder of whom in one action is impracticable. The disposition of their claims in a class action will provide substantial benefits to both parties and the Court. Upon information and belief, Defendants, either directly or through affiliated entities, are in possession of the names and addresses of all class members.

25. Class treatment is particularly appropriate here because the international presence of Defendants means that they conduct business in every jurisdiction in the United States. Further, this matter involves multiple federal statutes which were extensively and harmfully misapplied by Defendants.

**Risk of Inconsistent or Varying Adjudications**

26.     Prosecution of separate actions by class members would risk inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants.

27.     Further, the outcomes of separate actions by individual members of the class could, as a practical matter, be potentially dispositive of the interests of other members of the class and substantially impair or impede their ability to protect their interests. Class-wide adjudication of Plaintiffs' claims, therefore, is appropriate.

28.     Defendants have acted on grounds generally applicable to the class, thereby making class-wide adjudication of these claims appropriate.

**Common Questions of Law and Fact**

29.     There exists a well-defined community of interests and questions common to the class, which predominate over individual factual or legal questions. These common factual and legal questions include, but are not limited to:

(a)     Whether Defendants improperly applied the SCRA to class members' accounts, thereby denying them benefits to which they are entitled by law;

(b)     Whether Defendants' violations of the SCRA, and particularly Defendants' failure to forgive interest charges rather than adding them to the Plaintiffs' principal balances, caused the periodic account statements sent to class members to overstate principal and interest, among other errors, in violation of the Truth in Lending Act ("TILA"), 15 U.S. C. § 1601 *et seq.*;

(c)     Whether Defendants violated the Delaware Consumer Fraud Act, DEL. CODE. ANN. tit. 6, § 2511, *et seq.* ("DCFA"), and other applicable laws and regulations;

7

(d)     Whether Defendants' violations of the SCRA and TILA constitute a *per se* violation of the DCFA;

(e)     Whether the DCFA applies to every transaction stated herein taking place in Delaware;

(f)     Whether Defendants violated the North Carolina Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. § 75-1.1 *et seq.* ("UDTPA"), and other applicable laws and regulations;

(g)     Whether Defendants' violations of the SCRA and TILA constitute a *per se* violation of the UDTPA;

(h)     Whether the UDTPA applies to every transaction stated herein taking place in North Carolina;

(i)     Whether Defendants' proprietary SCRA program, as described herein, constituted an enforceable contract term or a separately enforceable contract between Defendants and class members, and whether Defendants' violations of the terms of its program gives rise to liability for breach of contract or violation of the SCRA;

(j)     Whether Defendants systematically steered military families to higher interest rate products, thereby charging higher interest rates to such families prior to their entering active military service, and thus depriving such families of the benefits to which they are entitled under the SCRA;

(k)     Whether Defendants have developed proprietary SCRA or restitution programs that unlawfully discriminate between accounts held by servicemembers and accounts held by their families;

(l)     Whether Defendants knew, reasonably should have known, or recklessly disregarded that their acts and practices were unlawful;

(m)     Whether Defendants' acts and practices were negligent;

(n)     Whether Defendants engaged in practices intending to deceive consumers;

(o)     Whether Defendants are entitled to an offset of damages for voluntary payments sent to some class members;

(p)     Whether Plaintiffs and class members who received such payments have suffered or will suffer damages when Defendants overstate the taxable component of the payments to the Internal Revenue Service, causing such class members to be charged excess taxes;

(q)     Whether Plaintiffs and the class are entitled to actual, consequential, and punitive damages;

(r)     Whether Plaintiffs and the class are entitled to an accounting;

(s)     Whether Defendants owed fiduciary duties to the Plaintiffs and the class and whether they breached such duties; and

(t)     Whether Plaintiffs and the class are entitled to recovery of attorney's fees and costs.

**Typicality**

30.     The individual Plaintiffs and the class representatives to be named are asserting claims that are typical of the claims of the entire class, and the class representatives will fairly and adequately represent and protect the interests of the class in that they have no interests antagonistic to those of the other members of the class.

### Fair and Adequate Representation

31.     The individual Plaintiffs have retained counsel who are competent and experienced in the handling of litigation, including class action litigation, and who will fairly and adequately represent and protect the interests of the class. Likewise, the class representatives will fairly and adequately represent and protect the interests of the class as a whole.

### Superiority of Class Action Procedure

32.     The individual Plaintiffs and other class members have all suffered damages as a result of Defendants' unlawful and wrongful conduct. Absent a class action, Defendants will likely retain a substantial unlawful gain, their conduct will go un-remedied and uncorrected, and the class members will likely be deprived of adequate relief. Class action treatment of these claims is superior to handling the claim in other ways.

33.     Certification of the class is appropriate under FED. R. CIV. P. 23.

## STATEMENT OF FACTS

### Plaintiffs Gary and Anne Childress

34.     Plaintiffs Gary and Anne Childress had one or more interest-bearing obligations to Defendants, including credit card debt, in 2008, when Gary Childress was called to active service in Iraq as part of the Army National Guard.

35.     On or around July 29, 2008, Gary Childress received orders requiring him to report to active duty on September 22, 2008.

36.     Gary Childress timely notified Defendants that he had entered active duty service, and requested that Defendants reduce the interest rate on his outstanding debt to 6%, as required by the SCRA. At the time, Mr. Childress' account had a balance and a significantly higher interest rate.

37.     Had the Childresses known that Defendants would fail to reduce their interest rates to 6% as required by the SCRA, they would have closed their accounts with Defendants and moved to another bank.

38.     Defendants subsequently sent account statements to the Childresses which reflected a 6% interest rate on their outstanding debt. These statements led the Childresses to believe that Defendants were in compliance with the SCRA.

39.     However, Defendants did not reduce the interest rate on the Childresses' accounts to 6% as required by the SCRA. Instead, Defendants applied a mathematical formula that charged interest at a rate significantly higher than that permitted under the SCRA. This practice was imperceptible to the Childresses, as their monthly statements contained misrepresentations that they were being charged the correct interest rate.

40.     The Childresses relied on the misrepresentations in Defendants' monthly account statements when choosing to maintain their accounts with Defendants. They also continued to use the accounts and incur more debt on them, to Defendants' benefit, based upon Defendants' representations that they were complying with the SCRA and their proprietary SCRA program. Had the Childresses known that Defendants were charging them a higher interest rate than permitted by the SCRA, they would have closed their accounts with Defendants and moved to another bank.

41.     The Childresses paid more in interest charges and fees on their accounts with Defendants than should have been due under a correct application of the SCRA and Defendants' proprietary SCRA program.

42.     The Childresses never received an accounting of the overcharged interest or improper fees. Upon information and belief, Defendants are still in possession of certain funds

which were obtained as a result of the overcharged interest on the Childresses' debt and improper fees.

43.     On May 6, 2016, Gary Childress received a check from Defendants for $6,899.00, along with a cover letter stating as follows: "We're writing to apologize because we may have charged you interest and/or fees incorrectly when you may have been eligible for Servicemember Civil Relief Act benefits or protections. Here's what we're doing. We're refunding you the interest and/or fees, plus an additional amount for the inconvenience. We're attaching a check for $6,899.00. . . . If required by tax-reporting rules, we'll send you an IRS Form 1099-MISC (Miscellaneous Income) or Form 1042-S (Foreign Person's U.S. Source Income Subject to Withholding) for the tax year in which the inconvenience payment was issued."

44.     The Childresses never received an accounting or similar documentation related to the check they received, or an explanation of how Defendants will determine the amount of taxable income to be reported to the Internal Revenue System.

45.     Gary Childress called Defendants on the number provided with the check and heard a recorded message to him and other class members. That message again misleadingly stated that Defendants "found that we may have charged you interest and/or fees incorrectly." Mr. Childress subsequently spoke to a representative of Defendants, who confirmed that the check was legitimate. However, in response to other questions, Defendants' agent provided a scripted response containing false and misleading information, such as informing Mr. Childress that he may or may not have tax liability and that the IRS, not Defendants, would determine whether he would receive a 1099-MISC form. When Mr. Childress asked which portion of the payment was for overcharges and which portion was for his inconvenience, the agent replied that Defendants did not have that information.

46.     The agent further acknowledged that Chase had conducted an audit for the period from 2005–2013 of all lines of business, including mortgages, personal accounts, credit card accounts, student loans, and loans from banks acquired by Defendants, including but not limited to Washington Mutual. She confirmed that Chase has not conducted an audit of the period after 2013.

**Plaintiffs Russell and Suzannah Ho**

47.     Plaintiffs Russell and Suzannah Ho had one or more interest-bearing obligations to Defendants, including credit card debt, in 2006, when Russell Ho was called to active service, and later when he was deployed to Iraq and Afghanistan.

48.     On or around October, 2006, Russell Ho entered active military service.

49.     Russell Ho timely notified Defendants that he had entered active duty service, and requested that Defendants reduce the interest rate on his outstanding debt to 6%, as required by the SCRA. At the time, Mr. Ho's account had a balance and a significantly higher interest rate.

50.     Had the Hos been aware that Defendants would fail to reduce their interest rates to 6% as required by the SCRA, they would have closed their accounts with Defendants and moved to another bank.

51.     Defendants subsequently sent account statements to the Hos which reflected a 6% interest rate on their outstanding debt. These statements led the Hos to believe that Defendants were in compliance with the SCRA.

52.     However, Defendants did not reduce the interest rate on the Hos' accounts to 6% as required by the SCRA. Instead, Defendants applied a mathematical formula that charged interest at a rate significantly higher than that permitted under the SCRA. This practice was imperceptible

to the Hos, as their monthly statements contained misrepresentations that they were being charged the correct interest rate.

53.    The Hos relied on the misrepresentations in Defendants' monthly account statements when choosing to maintain their accounts with Defendants. They also continued to use their accounts and incur more debt on them, to Defendants' benefit, based upon Defendants' representations that they were complying with the SCRA and their proprietary SCRA program. Had the Hos known that Defendants were charging them a higher interest rate than permitted by the SCRA, they would have closed their accounts with Defendants and moved to another bank.

54.    The Hos paid more in interest charges and fees on their accounts with Defendants than should have been due under a correct application of the SCRA and Defendants' proprietary SCRA program.

55.    The Hos never received an accounting of the overcharged interest and/or fees. Upon information and belief, Defendants are still in possession of certain funds which were obtained as a result of the overcharged interest and fees on the Hos debt.

56.    In May, 2016, Russell Ho received a check from Defendants for $570.00, along with a cover letter stating as follows: "We're writing to apologize because we may have charged you interest and/or fees incorrectly when you may have been eligible for Servicemember Civil Relief Act benefits or protections. Here's what we're doing. We're refunding you the interest and/or fees, plus an additional amount for the inconvenience. We're attaching a check for $570.00. . . . If required by tax-reporting rules, we'll send you an IRS Form 1099-MISC (Miscellaneous Income) or Form 1042-S (Foreign Person's U.S. Source Income Subject to Withholding) for the tax year in which the inconvenience payment was issued."

57.     The Hos never received an accounting or similar documentation related to the check they received, or an explanation of how Defendants will determine the amount of taxable income to be reported to the Internal Revenue System.

58.     Russell Ho called Defendants on the number provided with the check and heard a recorded message to him and other class members. That message again misleadingly stated that Defendants "found that we may have charged you interest and/or fees incorrectly." Mr. Ho subsequently spoke to a representative of Defendants, who confirmed that the check was legitimate. When Mr. Ho asked which portion of the payment was for overcharges and which portion was for his inconvenience, the agent replied that Defendants were still working out the numbers and didn't yet know the answer, but that Mr. Ho would find out when he received his 1099-MISC in 2017.

**Michael Clifford.**

59.     Plaintiff Michael Clifford had one or more interest-bearing obligations to Defendants, including credit card debt, during the past ten years while he was on active duty for the Air Force and Army.

60.     Michael Clifford timely notified Defendants of his active duty status, and requested that Defendants reduce the interest rate on his outstanding debt to 6%, as required by the SCRA. At the time, Mr. Clifford's accounts had a balance and a significantly higher interest rate.

61.     Had Michael Clifford known that Defendants would fail to reduce his interest rates to 6% as required by the SCRA, he would have closed his accounts with Defendants and moved to another bank.

62.     Defendants subsequently sent account statements to Michael Clifford which reflected a 6% interest rate on his outstanding debt. These statements led Mr. Clifford to believe that Defendants were in compliance with the SCRA.

63.     However, Defendants did not reduce the interest rate on Michael Clifford's accounts to 6% as required by the SCRA. Instead, Defendants applied a mathematical formula that charged interest at a rate significantly higher than that permitted under the SCRA. This practice was imperceptible to Mr. Clifford, as his monthly statements contained misrepresentations that he was being charged the correct interest rate.

64.     Mr. Clifford relied on the misrepresentations in Defendants' monthly account statements when choosing to maintain his accounts with Defendants. He also continued to use the accounts and incur more debt on them, to Defendants' benefit, based upon Defendants' representations that they were complying with the SCRA and their proprietary SCRA program. Had Mr. Clifford known that Defendants were charging him a higher interest rate than permitted by the SCRA, he would have closed his accounts with Defendants and moved to another bank.

65.     Michael Clifford paid more in interest charges and fees on his accounts with Defendants than should have been due under a correct application of the SCRA and Defendants' proprietary SCRA program.

66.     Mr. Clifford never received an accounting of the overcharged interest or improper fees. Upon information and belief, Defendants are still in possession of certain funds which were obtained as a result of the overcharged interest on Mr. Clifford's debt and improper.

67.     In May 2016, Michael Clifford received a check from Defendants for $1,044.00, along with a cover letter stating as follows: "We're writing to apologize because we may have charged you interest and/or fees incorrectly when you may have been eligible for Servicemember

Civil Relief Act benefits or protections. Here's what we're doing. We're refunding you the interest and/or fees, plus an additional amount for the inconvenience. We're attaching a check for $1,044.00. . . . If required by tax-reporting rules, we'll send you an IRS Form 1099-MISC (Miscellaneous Income) or Form 1042-S (Foreign Person's U.S. Source Income Subject to Withholding) for the tax year in which the inconvenience payment was issued."

68.     Mr. Clifford never received an accounting or similar documentation related to the check he received, or an explanation of how Defendants will determine the amount of taxable income to be reported to the Internal Revenue System.

69.     Mr. Clifford called Defendants repeatedly seeking an itemization of the overcharged interest and fees on his accounts and how his payment had been calculated. He was provided with a scripted response that provided no further information, As Defendants claimed to be unable to answer his questions. Mr. Clifford was told that he would know his tax liability only after he received a 1099-MISC in 2017. Defendants' agents told him that he could cash the payment check and that there were "no strings attached."

**Plaintiff David Cavender**

70.     Plaintiff David Cavender had one or more interest-bearing obligations to Defendants, including credit card debt, during the time he was on active duty for the Army. During his active duty, Mr. Cavender was deployed to Iraq from approximately September 2008 through October 2009.

71.     Mr. Cavender timely notified Defendants of his active duty status and requested that Defendants reduce the interest rate on his outstanding debt to 6%, as required by the SCRA.

72.    Had Mr. Cavender known that Defendants would fail to reduce his interest rates to 6% as required by the SCRA, he would have closed his accounts with Defendants and moved to another bank.

73.    Defendants subsequently sent account statements to Mr. Cavender which led Mr. Cavender to believe that Defendants were in compliance with the SCRA. While Mr. Cavender was on active duty, he hoped Chase was properly applying SCRA benefits to his account, but he was not double checking because he was focused on his military service. He also was not receiving his account statements while he was deployed.

74.    However, Defendants did not reduce the interest rate on Mr. Cavender's accounts to 6% as required by the SCRA. Instead, Defendants applied a mathematical formula that charged interest at a rate significantly higher than that permitted under the SCRA. This practice was imperceptible to Mr. Cavender.

75.    Mr. Cavender relied on Defendants to properly apply SCRA benefits to his account. He also continued to use the accounts and incur more debt on them, to Defendants' benefit, based upon Defendants' representations that they were complying with the SCRA and their proprietary SCRA program.

76.    Mr. Cavender paid more in interest charges and fees on his accounts with Defendants than should have been due under a correct application of the SCRA and Defendants' proprietary SCRA program. Defendants own calculations confirmed that Mr. Cavender was overcharged interest and fees between January 1, 2005 and September 18, 2013.

77.    Mr. Cavender has never received compensation from Defendants for the overcharges of interest and fees on his account.

78. Defendants carried out one or more remediation efforts between 2011 and 2017 ("Remediation Program") that further harmed Mr. Cavender. Defendants told the IRS that they paid Mr. Cavender $2050.32 of taxable income in 2016, even though he never received these funds or a copy of the 1099 form that Defendants sent to the IRS. The IRS received the 1099 form and adjusted Mr. Cavender's income, charging him additional taxes, a penalty, and interest for failing to timely report that supposed income from Defendants. Mr. Cavender has now paid taxes, penalties, and interest on that amount, but he still has not received the income from Defendants. Defendants failed to make reasonable efforts to ascertain Mr. Cavender's current address and failed to take appropriate action after sending the erroneous 1099 to the IRS.

**Plaintiff Rusty Davis**

79. Plaintiff Rusty Davis had one or more interest-bearing obligations to Defendants, including credit card debt, during the time he was on active duty for the Army. During his active duty, Mr. Davis was deployed to Iraq from approximately July 2006 through November 2007, where he worked to find improvised explosive devises (IEDs) and eliminate them. He was deployed again from August 2011 through April 2012 to Kuwait, from which he traveled to Afghanistan and Iraq. He has subsequently been on active duty since June 2012.

80. Rusty Davis timely notified Defendants of his active duty status and requested that Defendants reduce the interest rate on his outstanding debt to 6%, as required by the SCRA.

81. Had Mr. Davis known that Defendants would fail to reduce his interest rates to 6% as required by the SCRA, he would have closed his accounts with Defendants and moved to another bank.

82. Defendants subsequently sent account statements to Mr. Davis which led Mr. Davis to believe that Defendants were in compliance with the SCRA. While Mr. Davis was on active

duty, he hoped Chase was properly applying SCRA benefits to his account, but he was not double checking because he was focused on his military service. He also was not receiving his account statements while he was deployed.

83. However, Defendants did not reduce the interest rate on Mr. Davis's accounts to 6% as required by the SCRA. Instead, Defendants applied a mathematical formula that charged interest at a rate significantly higher than that permitted under the SCRA. This practice was imperceptible to Mr. Davis.

84. Mr. Davis relied on Defendants to properly apply SCRA benefits to his account. He also continued to use the accounts and incur more debt on them, to Defendants' benefit, based upon Defendants' representations that they were complying with the SCRA and their proprietary SCRA program.

85. Mr. Davis paid more in interest charges and fees on his accounts with Defendants than should have been due under a correct application of the SCRA and Defendants' proprietary SCRA program. Defendants own calculations confirmed that Mr. Davis was overcharged interest and fees sometime between January 1, 2005 and September 18, 2013.

86. Mr. Davis has never received compensation from Defendants for the overcharges of interest and fees on his account.

**Plaintiff Christopher Deringer**

87. Plaintiff Christopher Deringer had one or more interest-bearing obligations to Defendants, including credit card debt, during the time he was on active duty for the Army. Mr. Deringer is a disabled veteran, and during his active duty he was deployed to Iraq from approximately January 2004 through February 2005. For his service, he received an Army Commendation Medal, a Joint Service Achievement Medal, an Army Achievement Medal, and a Global War on Terrorism Expeditionary Medal.

88. Mr. Deringer timely notified Defendants of his active duty status and requested that Defendants reduce the interest rate on his outstanding debt to 6%, as required by the SCRA.

89. Had Mr. Deringer known that Defendants would fail to reduce his interest rates to 6% as required by the SCRA, he would have closed his accounts with Defendants and moved to another bank.

90. Defendants subsequently sent account statements to Mr. Deringer which led Mr. Deringer to believe that Defendants were in compliance with the SCRA. While Mr. Deringer was on active duty, he hoped Chase was properly applying SCRA benefits to his account, but he was not double checking because he was focused on his military service. He also was not receiving his account statements while he was deployed.

91. However, Defendants did not reduce the interest rate on Mr. Deringer's accounts to 6% as required by the SCRA. Instead, Defendants applied a mathematical formula that charged interest at a rate significantly higher than that permitted under the SCRA. This practice was imperceptible to Mr. Deringer.

92. Mr. Deringer relied on Defendants to properly apply SCRA benefits to his account. He also continued to use the accounts and incur more debt on them, to Defendants' benefit, based upon Defendants' representations that they were complying with the SCRA and their proprietary SCRA program.

93. Mr. Deringer paid more in interest charges and fees on his accounts with Defendants than should have been due under a correct application of the SCRA and Defendants' proprietary SCRA program. Defendants own calculations confirmed that Mr. Deringer was overcharged interest and fees sometime between January 1, 2005 and September 18, 2013.

94.     Mr. Deringer has never received any compensation from Defendants for the overcharges of interest and fees on his account.

95.     Defendants' Remediation Program further harmed Mr. Deringer. Defendants told the IRS that it paid Mr. Deringer $1137.77 of taxable income in 2016, even though he never received these funds or a copy of the 1099 form that Defendants sent to the IRS. Mr. Deringer is concerned that at some point, the IRS will accuse Mr. Deringer of not paying taxes on the amounts Defendants reported as taxable income, which could lead to an audit and/or a tax penalty.

96.     Defendants failed to make reasonable efforts to ascertain Mr. Deringer's current address and failed to take appropriate action after sending the erroneous 1099 to the IRS.

**Plaintiff Christina Duncan**

97.     Plaintiff Christina Duncan had one or more interest-bearing obligations to Defendants, including credit card debt, during the time she was on active duty for the Army. During her active duty, Ms. Davis was deployed to Afghanistan from approximately May 2011 to December 2011.

98.     Ms. Duncan timely notified Defendants of her active duty status and requested that Defendants reduce the interest rate on her outstanding debt to 6%, as required by the SCRA.

99.     On information and belief, Defendants never applied SCRA benefits to Ms. Duncan's accounts, denying her these benefits entirely. Ms. Duncan was never made aware why Defendants denied her benefits. While Ms. Duncan was on active duty she was focused on her military service and therefore did not have the time to challenge Defendants' denial. She also did not have regular access to mail and phones while she was deployed.

100.    Ms. Duncan paid more in interest charges and fees on her accounts with Defendants than should have been due under a correct application of the SCRA and Defendants' proprietary

SCRA program. Defendants own calculations confirmed that Ms. Duncan was overcharged interest and fees sometime between January 1, 2005 and September 18, 2013.

101.     Ms. Duncan has never received any compensation from Defendants for the overcharges of interest and fees on her account.

**Plaintiff Robin Hinson**

102.     Plaintiff Robin Hinson had one or more interest-bearing obligations to Defendants, including credit card debt, during the time she was on active duty for the Army National Guard. During her active duty, Ms. Hinson was deployed to Afghanistan from approximately July 2010 through July 2011, where she worked to clear routes of improvised explosive devises (IEDs) and sweep roads for bombs.

103.     Ms. Hinson worked for Defendants from September 2006 to May 2007 and was therefore aware of Chase's SCRA benefits program.

104.     Ms. Hinson timely notified Defendants of her active duty status and requested that Defendants reduce the interest rate on her outstanding debt to 6%, as required by the SCRA.

105.     Had Ms. Hinson known that Defendants would fail to reduce her interest rates to 6% as required by the SCRA, she would have closed her accounts with Defendants and moved to another bank.

106.     Defendants subsequently sent account statements to Ms. Hinson which led Ms. Hinson to believe that Defendants were in compliance with the SCRA. While Ms. Hinson was on active duty, she hoped Chase was properly applying SCRA benefits to her account, but she was not double checking because she was focused on her military service. She also was not receiving her account statements while she was deployed.

107. However, Defendants did not reduce the interest rate on Ms. Hinson's accounts to 6% as required by the SCRA. Instead, Defendants applied a mathematical formula that charged interest at a rate significantly higher than that permitted under the SCRA. This practice was imperceptible to Ms. Hinson.

108. Ms. Hinson relied on Defendants to properly apply SCRA benefits to her account. She also continued to use the accounts and incur more debt on them, to Defendants' benefit, based upon Defendants' representations that they were complying with the SCRA and their proprietary SCRA program.

109. Ms. Hinson paid more in interest charges and fees on her accounts with Defendants than should have been due under a correct application of the SCRA and Defendants' proprietary SCRA program. Defendants own calculations confirmed that Ms. Hinson was overcharged interest and fees sometime between January 1, 2005 and September 18, 2013.

110. Ms. Hinson has never received any compensation from Defendants for the overcharges of interest and fees on her account.

**Plaintiff David Ortiz**

111. Plaintiff David Ortiz had one or more interest-bearing obligations to Defendants, including credit card debt, during the time he was on active duty for the Army. During his active duty, Mr. Ortiz was deployed to Bahrain for approximately 10-11 months beginning in late 2008 as part of Operation Enduring Freedom.

112. Mr. Ortiz timely notified Defendants of his active duty status and requested that Defendants reduce the interest rate on his outstanding debt to 6%, as required by the SCRA.

113.     Had Mr. Ortiz known that Defendants would fail to reduce his interest rates to 6% as required by the SCRA, he would have closed his accounts with Defendants and moved to another bank.

114.     Defendants subsequently sent account statements to Mr. Ortiz which led Mr. Ortiz to believe that Defendants were in compliance with the SCRA. While Mr. Ortiz was on active duty, he hoped Chase was properly applying SCRA benefits to his account, but he was not double checking because he was focused on his military service. He also was not receiving his account statements while he was deployed.

115.     However, Defendants did not reduce the interest rate on Mr. Ortiz's accounts to 6% as required by the SCRA. Instead, Defendants applied a mathematical formula that charged interest at a rate significantly higher than that permitted under the SCRA. This practice was imperceptible to Mr. Ortiz.

116.     Mr. Ortiz relied on Defendants to properly apply SCRA benefits to his account. He also continued to use the accounts and incur more debt on them, to Defendants' benefit, based upon Defendants' representations that they were complying with the SCRA and their proprietary SCRA program.

117.     Mr. Ortiz paid more in interest charges and fees on his accounts with Defendants than should have been due under a correct application of the SCRA and Defendants' proprietary SCRA program. Defendants own calculations confirmed that Mr. Ortiz was overcharged interest and fees sometime between January 1, 2005 and September 18, 2013.

118.     Mr. Ortiz has never received compensation from Defendants for the overcharges of interest and fees on his account.

119.    Defendants' Remediation Program further harmed Mr. Ortiz.  Defendants told the IRS that it paid Mr. Ortiz $7661.98 of taxable income in 2016, even though he never received these funds or a copy of the 1099 form that Defendants sent to the IRS.  Mr. Ortiz is concerned that at some point, the IRS will accuse Mr. Ortiz of not paying taxes on the amounts Defendants reported as taxable income, which could lead to an audit and/or a tax penalty.

120.    Defendants failed to make reasonable efforts to ascertain Mr. Ortiz's current address and failed to take appropriate action after sending the erroneous 1099 to the IRS.

**General Allegations**

121.    In their communications with Plaintiffs and other class members, Defendants represented that they monitored the accounts of servicemembers using a nationwide proprietary and SCRA-compliant program.

122.    The terms of Defendants' proprietary program included certain benefits that Defendants considered to be more generous than those required by the SCRA. Further, the terms of the proprietary program were consistent with the benefits provided to servicemembers by other banks.

123.    Upon information and belief, the terms of Defendants' proprietary program were well documented, consistently applied, and communicated to class members, and became terms of the agreements between the parties.

124.    Upon information and belief, Defendants offered the proprietary program and its associated benefits to appear competitive in the consumer banking market and to retain the business of servicemembers. Plaintiffs and other class members relied on Defendants' representations regarding the proprietary program when deciding to maintain their accounts with Defendants and to incur more debts on those accounts. If Defendants had failed to provide this

competitive program, Plaintiffs and other class members would have closed their accounts with Defendants and moved to another bank.

125.    Despite their representations to Plaintiffs and other class members, Defendants failed to comply with the SCRA and the terms of their propriety program. Specifically, Defendants failed to reduce the interest rates on servicemembers' accounts as required, failed to waive all fees, and failed to properly calculate the debt forgiveness requirements of both the SCRA and Defendants' proprietary program.

126.    Further, Defendants failed to comply with the timing requirements of the SCRA and their proprietary program, under which reductions in the interest rates on servicemembers' accounts are effective on the date military orders are received.

127.    Defendants did not forgive incurred interest, including certain fees and charges, as required by the SCRA and their propriety program. As a result, Defendants overstated the outstanding balances on servicemembers' accounts, and unlawfully charged interest on those balances on a recurring basis.

128.    Defendants have not maintained adequate internal systems to ensure compliance with the SCRA.

129.    Defendants' violations of the SCRA and their own propriety program were carried out through complex computer calculations that were not discoverable by servicemembers, as the periodic account statements and other communications received by Plaintiffs and other class members incorrectly reflected that the interest rate on servicemembers' accounts was properly reduced.

130.     These violations caused damage to servicemembers, including the miscalculation of principal, interest, payoff amounts, and imposition of late fees and other charges.

131.     Further, Defendants' violations of the terms of their own proprietary SCRA program constituted a breach of their contracts with Plaintiffs and other class members.

132.     Upon information and belief, both Defendants' proprietary program and its restitution program implemented in response to its violations of the SCRA unlawfully discriminated between accounts held by servicemembers and accounts held by their families.

133.     As part of their proprietary program, Defendants represented that additional debts incurred by the accounts of servicemembers during active military service would accrue interest at 4%. In reliance on these terms, servicemembers and their families continued to incur debt on their accounts with Defendants during periods of active duty.

134.     However, Defendants charged a much higher rate than promised on this additional debt, despite their representations to Defendants and class members and in violation of the terms of their proprietary program.

135.     In addition, Defendants systematically steered military families to higher-interest rate products, thereby charging more interest from such families prior to active military service and depriving military families of the intended benefits of the SCRA and Defendants' proprietary program.

136.     In addition to violating the SCRA and their own proprietary program, Defendants made certain misrepresentations to Plaintiffs and other class members about their accounts that concealed and prevented Plaintiffs and class members from reasonably discovering such violations.

137.     For example, on a monthly basis Defendants sent Plaintiffs and class members account statements which reflected the appropriately reduced interest rate during times of active duty, when Defendants were in fact charging significantly higher interest rates on those accounts

in violation of the SCRA, the Truth in Lending Act ("TILA"), and Defendants' proprietary program. These higher interest rates improperly inflated Plaintiffs' and class members' outstanding balances, upon which Defendants then charged additional interest.

138. Defendants conducted an internal audit of their SCRA compliance, spanning the period from 2005–2013, and determined that they had systematically and repeatedly violated the SCRA by failing to apply the required interest rate to servicemembers' accounts during times of active military service. They confirmed that these violations occurred across all product lines, including mortgages, personal accounts, credit card accounts, student loans, notes, and loans from banks acquired by Defendants, including but not limited to Washington Mutual.

139. Chase has not conducted an audit of the period after 2013.

140. After Defendants discovered that they had charged servicemembers improperly high interest rates during military service in violation of the SCRA, Defendants never admitted such violations to Plaintiffs and other class members or provided any accounting of the overcharges.

141. Instead, Defendants sent unsolicited payment checks to some servicemembers, including Plaintiffs and other class members, with accompanying correspondence that misleadingly stated that Defendants "may have" overcharged interest or fees. The correspondence was often sent in a nondescript envelope that appeared to many servicemembers as a solicitation or "junk mail."

142. When Plaintiffs and class members contacted Defendants to inquire about the payment checks they received, they were provided scripted answers that contained misleading and false information.

143.     Based upon the actions of other banks, Plaintiffs and other class members expect to receive tax forms from Defendants suggesting that at least a portion of the payment checks are taxable income. Without an accounting, Plaintiffs will have no way to determine whether the correct amounts will be reported as taxable. Without a proper accounting of Defendants' SCRA violations and reimbursement program, Plaintiffs and class members are without recourse to challenge Defendants' reporting to taxing authorities.

144.     Through various forms of communication, Defendants have admitted to Plaintiffs and other class members that they charged improperly high interest rates and improper fees on servicemembers' accounts during times of active duty in violation of the SCRA and their own proprietary program. Defendants' admissions have been confirmed by an investigation of the Office of the Comptroller of Currency, which found that Defendants "Failed to have in place effective policies and procedures across the Bank to ensure compliance with the SCRA" and called the Bank's efforts to comply with the SCRA to be "reckless unsafe or unsound."[1]

145.     Defendants' acts and omissions, including their failure to comply with the SCRA and their own proprietary program, caused damage to the Plaintiffs, including but not limited to payment of additional, unnecessary, and improper interest, charges and fees.

146.     In addition, upon information and belief, Defendants are still in possession of certain funds belonging to Plaintiffs and class members which were obtained as a result of the overcharged interest on servicemembers' accounts.

147.     The damages to servicemembers are significant in part because Defendants have instituted policies and practices to steer servicemembers toward products with higher interest rates than those recommended to other consumers. Damages caused by Defendants' violations of the

---

[1] Consent Order for a Civil Money Penalty, In the Matter of JPMorgan Chase Bank, N.A. et al, Cause No. AA-EC-2014-64 (July 8, 2015).

SCRA and their proprietary program were therefore compounded by these high interest rates, contributing to the financial woes of many families with a servicemember abroad.

148.    Defendants' failure to comply with the SCRA, the TILA, and its own proprietary program resulted in significant wrongful gain, based on the improperly high interest rates charged to the accounts of Plaintiffs and other class members during periods of active military service.

## ALLEGATIONS AS TO DISCOVERY

149.    Due to Defendants' misrepresentations to Plaintiffs and class members and concealment of SCRA violations, Plaintiffs and class members had no reasonable opportunity to discover the violations until this year. That Defendants' violations were self-concealing is evident by the fact that they continued the nationwide practice of overcharging active military servicemembers for more than a decade.

150.    Upon information and belief, the violations and breaches described herein are ongoing. Defendants' violations of the SCRA resulted in improper inflation of the principal balances owed by Plaintiffs and class members, and subsequent monthly interest being charged on these inflated balances. Thus, each and every month in which Defendants overcharged interest on servicemembers' accounts as required by the SCRA, or failed to forgive debt that accrued as a result of this failure, constituted an ongoing violation of, *inter alia*, the SCRA.

151.    Each month, Defendants sent incorrect periodic statements to Plaintiffs and class members, constituting an ongoing violation of the SCRA, TILA, the Delaware Consumer Fraud Act ("DCFA"), the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), and other laws and regulations.

152.    Defendants further violated the TILA, DCFA, and UDTPA when they sent correspondence to servicemembers containing misrepresentations that were designed to conceal

Defendants' violations of the SCRA and discourage further investigation by Plaintiffs and class members. Defendants' actions, including their misrepresentations, and failure to provide an accounting of their SCRA violations, constitute further violations of statutory and common law and have caused further damages to Plaintiffs and class members.

153.     The policies behind the SCRA, and the facts described herein, require an equitable tolling of any statute of limitations. Defendants have overcharged servicemembers for over a decade, and in many cases, the servicemembers' active duty status hindered their ability to discover these violations. Defendants should not be allowed to retain their ill-gotten gains resulting from such improper activity.

## FIRST CAUSE OF ACTION
### (Violation of the Servicemembers Civil Relief Act)

154.     Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

155.     Plaintiffs have a private right of action for violations of the SCRA pursuant to 50 U.S.C. § 4042 (formerly 50 U.S.C. App. § 597a).

156.     The SCRA, formerly known as the War and National Defense Soldiers' and Sailors' Civil Relief Act of 1940, guarantees that all debts incurred by a servicemember or servicemember reservist before being called to active duty will be reduced to an interest rate of 6% from the date of receipt of their orders, and during the ensuing active duty period as required by 50 U.S.C. § 3937 (formerly 50 U.S.C. App. § 527). Several classes of fees and charges qualify as interest. Any interest above the 6% must be forgiven and cannot be deferred.

157.     Defendants violated the SCRA by failing to properly apply its provisions to the accounts and outstanding debt of Plaintiffs and other class members. Specifically, Defendants charged interest rates higher than 6% on the accounts of Plaintiffs and class members during active

military service, and failed to forgive overcharged interest as required by the SCRA. As a result, Defendants improperly inflated servicemembers' principal balances, and subsequently charged compounded interest on those balances.

158.    Further, Defendants systematically steered military families to higher-interest rate products, thereby charging more interest from such families prior to military service and depriving military families of their statutory benefits.

159.    Defendants were aware of the provisions and requirements of the SCRA. Defendants either knew, reasonably should have known, or recklessly disregarded their failure to comply with the SCRA and the exploitative and deceptive nature of their policies, procedures, and decisions.

160.    Plaintiffs incurred damages as a result of Defendants' violations of the SCRA. For many class members, this harm is ongoing. As a result, Plaintiffs and the class members seek relief.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

161.    Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

162.    Defendants developed a propriety SCRA program that was implemented nationwide, which Defendants call "Beyond the Servicemembers Civil Relief Act." Defendants' conduct and communications informed Plaintiffs and class members of the terms of this program, with an understanding that they would rely upon that program in managing their financial affairs while a servicemember was engaged in active military service. Defendants' proprietary program was developed and offered to maintain competitiveness in the banking industry and to retain the

business of servicemembers; Defendants knew that if their program was not competitive, servicemembers would move their business to another bank.

163. Defendants' proprietary SCRA program either constituted an enforceable term of Defendants' contract with Plaintiffs and class members, or constituted a separate enforceable contract between Defendants, Plaintiffs, and other class members.

164. In addition, Defendants' contracts with Plaintiffs and class members contain an implied covenant of good faith and fair dealing which required Defendants to deal fairly and in good faith with Plaintiffs and class members.

165. Plaintiffs and other class members maintained their accounts with Defendants and incurred additional debt on those accounts, to Defendants' benefit, in reliance on the proprietary program and the purported benefits offered by Defendants, which were competitive with those offered by other banks.

166. For example, but not by way of limitation, Defendants represented that during servicemembers' active military service, debts incurred by their accounts would accrue interest at 4%, and that all fees would be waived. Defendants' website promises "Interest rates 2% lower than SCRA requires – You could lower your interest rate to 4% while on active duty and for a year afterward." The proprietary program contained additional valuable benefits.

167. Defendants sent out form letters to military servicemembers that were substantially identical, which described their proprietary program as follows:

> We're dedicated to supporting our members of the military and are pleased to let you know that your account is eligible for benefits under the Servicemembers Civil Relief Act.
>
> Your credit card account qualifies for SCRA benefits described in this letter. If you have other accounts of banking relationships with us, those account will also be evaluated to see if similar benefits are applicable. You will receive a separate response for other accounts you may have with us

- *You'll receive maximum Annual Percentage Rate (APR) of 4% for your entire account balance, including new purchases*

- *If you have a lower APR on any existing balance such as an introductory or promotional rate, you'll receive the lower rate until it expires*

- *Your account in now exempt from all fees, including foreign transaction frees, late fees, and annual fees*

- *All fees and interest charges on your account balance will be recalculated from the date provided on your official documentation. You will receive a credit for any necessary adjustments on your upcoming statement.*

168.    Defendants violated the terms of their proprietary SCRA program, and thereby breached their contracts with Plaintiffs and class members.

169.    Defendants charged Plaintiffs and class members more interest and fees than was permitted by their proprietary SCRA program. Plaintiffs, in reliance on the program and certain representations from Defendants, as described herein, paid the improper interest charges and fees, and Defendants currently retain those payments.

170.    Defendants' actions also constituted a breach of the implied covenant of good faith and fair dealing contained in their contracts with Plaintiffs and other class members.

171.    Plaintiffs and class members have been damaged by Defendants' breach of contract in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### (Violation of Truth in Lending Act)

172.    Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

173.    Pursuant to 15 U.S.C. § 1637(b), monthly statements provided by "[t]he creditor of any account under an open consumer credit plan" shall include, *inter alia*:

- "The amount of any finance charge added to the account during the period, itemized to show the amounts, if any, due to the application of percentage rates," § 1637(b)(4);

- "Where one or more periodic rates may be used to compute the finance charge, each such rate, the range of balances to which it is applicable, and . . . the corresponding nominal annual interest rate," § 1637(b)(5); and

- "Where the total finance charge exceeds 50 cents for a monthly or longer billing cycle . . . the total finance charge expressed as an annual percentage rate," § 1637(b)(6).

174.    Defendants violated § 1637 and, upon information and belief, other provisions of the Truth in Lending Act ("TILA") by providing monthly account statements to Plaintiffs and other class members which inaccurately reflected the interest rate that Defendants were applying to the outstanding debt of servicemembers during active military duty. In reality, Defendants applied a mathematical formula that charged interest at a rate significantly higher than that permitted under the SCRA and the proprietary program.

175.    Plaintiffs and other class members relied on the misrepresentations contained in Defendants' monthly account statements when choosing to maintain their accounts with Defendants. Had Plaintiffs known that Defendants were charging them an illegally high interest rate in violation of the SCRA and Defendants' proprietary program, or that Defendants' SCRA benefits were not competitive with those offered by other banks, they would not have incurred additional debt on their accounts but rather would have closed their accounts with Defendants and moved to another bank.

176.    Defendants' violations of the TILA deceived Plaintiffs and class members, concealed Defendants' SCRA violations, and caused damages to Plaintiffs and the class.

**FOURTH CAUSE OF ACTION**
**(Negligence)**

177.    Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

178.    Certain actions by Defendants, including but not limited to the creation of their proprietary and reimbursement programs, created a duty to deal with Plaintiffs and class members fairly and in good faith.

179.    Defendants breached their duty to Plaintiffs and class members by violating the SCRA and their proprietary program, concealing such violations from Plaintiffs and class members, and making misrepresentations regarding the nature of their reimbursement program and the payment checks issued to Plaintiffs and class members.

180.    Defendants knew, reasonably should have known, or recklessly disregarded their duty to treat Plaintiffs and class members fairly and deal with them in good faith.

181.    Defendants' negligence and breach of their duties was the proximate cause of damages sustained by the Plaintiffs and the class.

**FIFTH CAUSE OF ACTION**
**(Negligent Misrepresentation)**

182.    Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

183.    As described herein, Defendants provided certain information to Plaintiffs and other class members regarding the interest rates being charged on their outstanding debt during periods of active military service and the basis for certain payment checks sent to Plaintiffs.

184.     Specifically, Plaintiffs' and class members' periodic account statements reflected a lower interest rate than actually charged on their outstanding debt during active duty, and Defendants claimed that the basis for the payment checks was that Defendants "may have charged" improper interest and fees, when in fact Defendants had documented the overcharges.

185.     This information was false, as Defendants were actually charging Plaintiffs and class members improperly high interest rates in violation of the SCRA and their proprietary program, and the communications were designed to conceal the full nature of the violations.

186.     Plaintiffs and other class members suffered damage as a result of their reliance on Defendants' false information, as they were charged illegally high interest rates and improper fees on their outstanding debt during active duty, in violation of the SCRA.

187.     As a direct result of the Defendants' improper and negligent actions, Plaintiffs and other class members sustained an ascertainable loss as well as other damages. As a result, Plaintiffs and the class members seek relief.

## SIXTH CAUSE OF ACTION
### (Violation of DEL. CODE. ANN. tit. 6, § 2511, *et seq.*)

188.     Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

189.     Under the Delaware Consumer Fraud Act, DEL. CODE. ANN. tit. 6, § 2511, *et seq.* ("DCFA"), any person who acts, uses or employs any deception, fraud, false pretense, false promise or misrepresentation in connection with the sale or advertisement of any merchandise shall be deemed in violation of the DCFA. The term "merchandise" under the DCFA includes services. DEL. CODE. ANN. tit. 6, § 2511(b).

190.     The acts described herein constitute a violation of the DCFA. Defendants provided Plaintiffs and other class members with communications, including periodic account statements,

during their periods of military service which reflected an incorrect interest rate on their outstanding debt, even though Defendants were actually charging much higher rates, in violation of the SCRA and Defendants' proprietary program.

191. Further, Defendants, through both written and telephone communications, negligently misrepresented to Plaintiffs and other class members that the payment checks they received were because Defendants "may have" overcharged interest and fees, concealing from Plaintiffs and class members that Defendants had confirmed that they had overcharged servicemembers in violation of the SCRA and Defendants' proprietary program. Defendants also misled Plaintiffs and the class about the tax ramifications of the payments.

192. Defendants' actions were egregious, aggravated, and undertaken with disregard for the rights of Plaintiffs and other class members.

193. In the alternative, Defendants' violations of the SCRA and TILA, as described herein, constitute *per se* violations of the DCFA.

194. Defendants' unfair and deceptive acts were the actual and proximate cause of damage to Plaintiffs and other class members because Plaintiffs relied on Defendants' misrepresentations and concealment of material facts when deciding to maintain their accounts with Defendants and accruing additional debt.

195. Due to Defendants' unfair and deceptive acts, Plaintiffs and other class members sustained an ascertainable loss as well as other damages. As a result, Plaintiffs and the class members seek relief, including restitution, recovery of fees, and a $10,000 penalty per violation.

## SEVENTH CAUSE OF ACTION
### (Violation of N.C. GEN. STAT. § 75-1.1 *et seq.*)

196.    Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

197.    Defendants' negligence and negligent misrepresentations toward Plaintiffs and other class members constitutes violations of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. § 75-1.1 *et seq.* ("UDTPA").

198.    Specifically, Defendants provided Plaintiffs and other class members with communications, including periodic account statements, during their periods of military service which reflected an incorrect interest rate on their outstanding debt, even though Defendants were actually charging much higher rates, in violation of the SCRA and Defendants' proprietary program.

199.    Further, Defendants, through both written and telephone communications, negligently misrepresented to Plaintiffs and other class members that the payment checks they received were because Defendants "may have" overcharged interest and fees, concealing from Plaintiffs and class members that Defendants had confirmed that they had overcharged servicemembers in violation of the SCRA and Defendants' proprietary program. Defendants also misled Plaintiffs and the class about the tax ramifications of the payments.

200.    Defendants' actions were egregious, aggravated, and undertaken with disregard for the rights of Plaintiffs and other class members.

201.    In the alternative, Defendants' violations of the SCRA and TILA, as described herein, constitute *per se* violations of the UDTPA.

202.     Defendants' unfair and deceptive acts have "affected commerce" and were "acts or practices in and affecting commerce" within the meaning of N.C. GEN. STAT. § 75-1.1 *et seq.* because they were directly related to the consumer banking markets, and may have affected Plaintiffs' and other class members' credit ratings and financial well-being.

203.     Defendants' unfair and deceptive acts were the actual and proximate cause of damage to Plaintiffs and other class members because Plaintiffs relied on Defendants' misrepresentations and concealment of material facts when deciding to maintain their accounts with Defendants.

204.     Due to Defendants' unfair and deceptive acts, Plaintiffs and other class members sustained an ascertainable loss as well as other damages. As a result, Plaintiffs and the class members seek relief.

205.     In addition, Plaintiffs and the other class members are entitled to treble damages and attorneys' fees pursuant to N.C. GEN. STAT. § 75-16 and § 75-16.1.

## EIGHTH CAUSE OF ACTION
### (Constructive Trust)

206.     Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

207.     As described herein, Defendants have engaged, and are upon information and belief currently engaging, in improper conduct in violation of federal law which has caused damage to Plaintiffs and other class members.

208.     In addition, Defendants have wrongfully obtained, and will continue to retain, certain funds and profits as a result of their misconduct, which legally belong to Plaintiffs and other class members.

209.     Plaintiffs and other class members are entitled to the imposition of a constructive trust containing all assets, funds, and property derived from Defendants' wrongful acts, with Defendants serving as constructive trustees for the benefit of Plaintiffs.

### NINTH CAUSE OF ACTION
**(Breach of Fiduciary Duty)**

210.     Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

211.     Defendants did not have a typical arms-length lender/borrower relationship with Plaintiffs and class members. In the unique facts of this case, Defendants took on a role of fiduciary to the Plaintiffs and the class.

212.     The facts giving rise to the fiduciary duty include by are not limited to the following:

- Defendants specifically marketed to servicemembers, and particularly to those servicemembers who were deployed overseas;

- Defendants volunteered advice to servicemembers and their families with the intent that Defendants would become their trusted advisor on financial and non-financial matters. The website for Defendants' proprietary program, chasemilitary.com, states, for example: "Chase Military Services Hotline. For assistance with any account-related matters, as well as education and employment opportunities at Chase, you can call our dedicated Chase Military Services Team. Our team is staffed by trained experts who are knowledgeable about SCRA benefits, Military POAs, Military Allotments, Transport Permission letters and other matters relating

42

to military life." Defendants touted themselves as a source of trusted information for servicemembers about SCRA benefits.

- Plaintiffs and class members provided Defendants with documentation of their military status, which typically included overseas deployment orders., and Defendants maintained an online portal for receiving such information. Thus, Defendants solicited and received notice that Plaintiffs and class members would be deployed overseas and could not fully monitor their accounts or act in an arms-length manner with the Defendants during periods of active military service.

- The SCRA reflects a Congressional determination that servicemembers cannot and should not be required to protect their own financial interests while serving full time in the U.S. military. By participating in the SCRA program and specifically marketing a "Beyond the SCRA" proprietary program, Defendants have acknowledged this unequal relationship and taken on fiduciary duties.

213. Defendants have breached the fiduciary duties owed to Plaintiffs and the class, causing damages and entitling Plaintiffs and the class to an accounting, restitution, and other equitable remedies.

## TENTH CAUSE OF ACTION
### (Accounting)

214. Plaintiffs incorporate each and every allegation contained in the preceding paragraphs as if set forth again herein.

215. Pursuant to federal and state law, Plaintiffs and other class members are entitled to recover certain actual, consequential, and punitive damages based on the present and future revenues and profits of Defendants based on their fraudulent, improper, and illegal actions.

216. The amount of damages owed to Plaintiffs and other class members is currently unknown and cannot be ascertained without an accounting of the revenues and profits made by Defendants which are attributable to their wrongful and illegal acts.

217. Accordingly, Plaintiffs and other class members are entitled to an accounting of all assets, funds, revenues, and profits received and retained by Defendants as a result of their improper actions, as described herein.

## PRAYER FOR RELIEF

**WHEREFORE,** on behalf of themselves and all other persons similarly situated, Plaintiffs respectfully pray for the following relief:

a. An Order certifying the class, appointing the named Plaintiffs and class members as class representatives and Plaintiffs' attorneys as class counsel;

b. Factual findings that Defendants have violated the Servicemembers Civil Relief Act, the Truth in Lending Act, the Delaware Consumer Fraud Act, the North Carolina Unfair and Deceptive Trade Practices Act, and other applicable statutes and rules;

c. An Order requiring disgorgement of Defendants' ill-gotten gains to pay restitution to Plaintiffs and all members of the class;

d. An award of compensatory, consequential, and punitive damages;

e. An award of treble damages and attorneys' fees and costs pursuant to the North Carolina Unfair and Deceptive Trade Practices Act;

f.  An award of pre-and post-judgment interest;

g.  The imposition of a constructive trust containing all assets, funds, and property derived from Defendants' wrongful acts, with Defendants serving as constructive trustees for the benefit of Plaintiffs and class members;

h.  An accounting of all assets, funds, revenues, and profits received and retained by Defendants as a result of their improper actions;

i.  A jury trial on all issues so triable; and

j.  Such other relief as this Court may deem just and proper.

This the 11th day of March 2020.

SHANAHAN LAW GROUP, PLLC

By:     /s/*Kieran J. Shanahan*
        Kieran J. Shanahan, NCSB# 13329
        Brandon S. Neuman, NCSB# 33590
        Christopher S. Battles, NCSB# 42682
        128 E. Hargett Street, Third Floor
        Raleigh, North Carolina 27601
        Telephone: (919) 856-9494
        Facsimile: (919) 856-9499
        kieran@shanahanlawgroup.com
        bneuman@shanahanlawgroup.com
        cbattles@shanahanlawgroup.com

SMITH & LOWNEY, PLLC

By:     /s/*Knoll D. Lowney*
        Knoll D. Lowney, WSBA# 23457
        Claire Tonry, WSBA# 44497
        2317 E. John Street
        Seattle, Washington 98112
        Telephone: (206) 860-2883
        Facsimile: (206) 860-4187
        knoll@smithandlowney.com
        claire@smithandlowney.com

**KELLER ROHRBACK L.L.P.**

By:     /s/*Mark A. Griffin*
      Mark A. Griffin
      Raymond J. Farrow
      1201 3d Avenue, Suite 3200
      Seattle, WA 98101
      Telephone: (206) 623-1900
      Facsimile: (206) 623-3384
      mgriffin@kellerrohrback.com
      rfarrow@kellerrohrback.com

      Attorneys for Plaintiffs and Class Counsel